UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHN LOPEZ,

               Plaintiff,                              **DECISION AND ORDER**

     -v-                                       6:17-CV-06305 EAW

PAUL CHAPPIUS, JR., et al.,

               Defendants.
_____

## <u>INTRODUCTION</u>

*Pro se* plaintiff John Lopez ("Plaintiff" or "Lopez"), an inmate formerly incarcerated at the Elmira Correctional Facility ("Elmira"), commenced this action on May 15, 2017, seeking relief under 42 U.S.C. § 1983. (Dkt. 1). Plaintiff subsequently filed an amended complaint, which is now the operative pleading. (Dkt. 8). Plaintiff alleges that defendants Elmira Superintendent Paul Chappius, Jr. ("Chappius"); Deputy Superintendent of Programs John Mizgala ("Mizgala"); Assistant Deputy Superintendent of Programs Frank Rhodes, ("Rhodes"); and Religious Coordinating Chaplain T. Hawk ("Hawk") (collectively "Defendants") violated his First Amendment right to exercise his religion when they failed  to provide Plaintiff with seventeen Rastafarian holy feast day meals during his confinement in Elmira's Involuntary Protective Custody Unit ("IPCU"). (*See id.* at ¶¶ 5-8, 12, 39).

Currently before the Court is Defendants' motion for summary judgment. (Dkt. 59). For the reasons discussed below, the motion is granted in part and denied in part.

- 1 -

## BACKGROUND

I.    **Factual Background**

The following facts are taken from Defendants' Statement of Undisputed Facts (Dkt. 59-1), Plaintiff's Declaration in Opposition (Dkt. 72), Plaintiff's Statement of Disputed Facts (Dkt. 72-1), and the exhibits submitted by the parties.  Where the particular facts are controverted, the Court has noted the disagreement.

Plaintiff alleges he was an inmate in Elmira's IPCU from June 5, 2012, to March 31, 2015.  (Dkt. 72 at ¶ 5).[1]  Plaintiff is a Rastafarian, and claims that Defendants failed to provide him with seventeen holy feast day meals (the "Holy Meals") during his time in the IPCU.  (*Id.*).  Plaintiff alleges that Holy Meals occur six times per year: January 7, May 5, July 23, August 17, October 7, and November 2.  (Dkt. 8 at ¶¶ 43-50).

Plaintiff submitted five grievances to Elmira relating to missed Holy Meals.  (Dkt. 72 at ¶ 32).  Plaintiff submitted his first grievance on or about April 11, 2013, numbered EL-40-769-13 (the "First Grievance").  (Dkt. 72-3 at 22-23).  In it, among other things, he complained that he had not been given any of his Holy Meals after being moved to the IPCU eleven months earlier.  (*Id.* at 22).  He also reminded DOCCS officials that there was a holy day approaching on May 5, 2013.  (*Id.*).  Elmira officials granted the First Grievance, recognizing that Plaintiff was entitled to the Holy Meals but noting that he may not have

---

[1]    The parties dispute exactly when Plaintiff arrived at Elmira's IPCU.  (*Compare* Dkt. 72 at ¶ 5 (start date on June 5, 2012) *with* Dkt. 59-1 at ¶ 5 (start date on July 19, 2012)).  However, the difference in dates is not material because, according to Plaintiff, no Rastafarian holy feast days occurred during this time-gap.  (*See* Dkt. 72-3 at 7 (no religious holidays occurring between June 5 and July 19)).

received them due to a lack of understanding about the proper procedures. (*Id*. at 23). Plaintiff was assured that future meals would be provided. (*Id.*). Plaintiff appealed. (*Id*. at 24-25). Elmira officials upheld the initial determination, but noted that the May 5, 2013 Rastafarian religious event was canceled because the assigned cooks refused to prepare the meal at the last minute. (*See id.* at 27-29).

Plaintiff submitted a second grievance on or about October 7, 2013, numbered EL-41-619-13 (the "Second Grievance"). (*Id.* at 60-64). In it, Plaintiff complained that another Holy Meal was not delivered to him in the IPCU on October 7, 2013, and that no Holy Meals had been delivered to him to date. (*Id.*). Elmira officials denied the Second Grievance, indicating that the Chaplain denied refusing to provide meals and finding no evidence that the meal was not delivered. (*Id*. at 65). Plaintiff's appeal (*id.* at 66-67) was denied after Elmira officials again found no evidence of malfeasance (*id*. at 69).

Plaintiff submitted a third grievance on or about May 8, 2014, numbered EL-42-560-14 (the "Third Grievance"). (*Id.* at 31-35). In it, he again complained that no Holy Meals had been provided during the 24 months he had been in the IPCU, despite multiple promises that they would be delivered. (*Id*. at 32-34). The Third Grievance was granted in part. (*Id.* at 37). Plaintiff appealed. (*Id.* at 37). Plaintiff's appeal was denied based on an investigation revealing that Plaintiff had received his religious meal on May 5, 2014. (*Id.* at 39, 45).

Plaintiff submitted a fourth grievance on or about October 8, 2014, numbered EL-43-103-14 (the "Fourth Grievance"). (*Id.* at 41-43). In it, he complained of missing all of his Holy Meals for the 28 months he was confined in the IPCU and further claimed that

these missed meals were due to "intentional" and "malicious" misconduct. (*Id*. at 42). Specifically, he complained of not receiving his Holy Meal on October 7, 2014. (*Id.*). The Fourth Grievance was denied, with Elmira officials finding that Plaintiff was removed from the religious holiday list by mistake, not by any intentional misconduct. (*Id.* at 47). Plaintiff appealed, and Elmira officials acknowledged that Plaintiff did not receive his Holy Meal but affirmed that no malicious wrongdoing occurred. (*Id*. at 47).

Lastly, Plaintiff submitted a fifth grievance on or about November 10, 2014, numbered EL-43-224-14 (the "Fifth Grievance"). (*Id.* at 49-52). In it, Plaintiff again complained of intentional misconduct relating to his Holy Meal on November 2, 2014, this time claiming that he was given a meal that was tampered with and not sealed properly. (*Id*. at 50). Plaintiff noted that this was the first Holy Meal he had received in the 29 months he was housed in the IPCU and that it was sabotaged. (*Id.* at 51-52). Elmira officials granted the Fifth Grievance to the extent that they agreed to wrap the meals in the same manner as other religious meals. (*Id.* at 54). Plaintiff appealed, and Elmira officials found that there was no evidence of tampering with the meal. (*Id.* at 56).

In addition to the formal grievances, Plaintiff wrote letters of complaint to various Elmira staff and supervisors. (*See id.* at 2-4 (letter to Hawk dated October 8, 2013), 6-8 (letter to Mizgala dated October 10, 2013), 10-11 (letter to Chappius dated July 24, 2013), 13 (letter to Hawk dated May 4, 2014), 15 (letter to Mizgala dated May 4, 2014), 17-18 (letter to Hawk dated October 29, 2014), 20 (letter to Rhodes dated October 29, 2014), 71 (letter to Hawk dated September 22, 2013), and 73 (letter to Hawk dated September 25, 2013)).

- 4 -

## II.     Procedural Background

Plaintiff commenced the instant action on May 15, 2017.  (Dkt. 1).  On September 24, 2018, the Court granted Plaintiff's motion for leave to proceed *in forma pauperis*.  (Dkt. 7).  On November 9, 2018, Plaintiff filed an amended complaint, which is the operative pleading here.  (Dkt. 8).  Following this Court's denial of Defendants' motion to dismiss (Dkt. 19), the parties proceeded with discovery.

Defendants moved for summary judgment on July 22, 2022.  (Dkt. 59).  Plaintiff filed his opposition on October 20, 2022.  (Dkt. 72).  Defendants filed their reply on November 4, 2022.  (Dkt. 74).  Plaintiff was granted leave to file a sur-reply (Dkt. 76), which he filed on December 22, 2022 (Dkt. 77).

## DISCUSSION

## I.     Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact . . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the

- 5 -

party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts[] and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"Where one party is proceeding *pro se*, the Court reads the *pro se* party's papers liberally and interprets them 'to raise the strongest arguments that they suggest.'" *Thorne v. Lewis*, No. 3:19CV24(VLB), 2021 WL 4324475, at *2 (D. Conn. Sept. 23, 2021) (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015)).  Despite this liberal approach, allegations unsupported by admissible evidence "do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## II.     Defendants' Summary Judgment Motion

Defendants set forth three grounds for summary judgment.  First, they argue that Plaintiff has not exhausted his administrative remedies for most of the allegedly improper conduct.  (Dkt. 59-8 at 13-14).  Second, they contend that Plaintiff has set forth no evidence of any wrongdoing by any Defendants to support his First Amendment claim.  (*Id*. at 5-9).  And third, they argue that Plaintiff cannot demonstrate the requisite personal involvement of Defendants Chappius, Mizgala, and Rhodes.  (*Id*. at 9-13).  The Court addresses each of these arguments below.

### A.     Exhaustion of Remedies

Defendants argue that they are entitled to summary judgment with respect to Plaintiff's claims arising from alleged missed Holy Meals for which Plaintiff failed to adequately exhaust his administrative remedies.  (*Id*. at 13-14).  Plaintiff did not meaningfully address this argument in his opposition to Defendants' motion, which could serve as a basis to grant the relief, but in light of Plaintiff's *pro se* status and his otherwise detailed submissions, the Court will consider the merits of Defendants' arguments.[2]  On this record, the Court agrees that Plaintiff failed to exhaust his administrative remedies with respect to alleged missed Holy Meals occurring on July 23, 2012; August 17, 2012;

---

[2]      "A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."  *Banyan v. Sikorski*, No. 17-CV-4942 (LJL), 2021 WL 2156226, at *2 (S.D.N.Y. May 27, 2021) (finding summary judgment appropriately granted based on the plaintiff's "failure to respond to arguments set forth in a moving party's brief").

October 7, 2012; November 2, 2012; and January 7, 2013, but concludes that Plaintiff has demonstrated sufficient exhaustion for the remaining Holy Meals at issue.

An inmate plaintiff "must fully complete the administrative review process before commencing [an] action." *Garraway v. Smith*, No. 12-CV-924S, 2020 WL 491328, at *3 (W.D.N.Y. Jan. 30, 2020). "'Proper exhaustion' requires a plaintiff to procedurally exhaust his claims by 'compl[ying] with the system's critical procedural rules.'" *Id*. (quoting *Woodford v. Ngo*, 548 U.S. 81, 95 (2006)). In New York, this entails going through a three-step appeal procedure set out in N.Y.C.C.R. § 701.5. *Id*. at *4. This section provides that:

> (1) the inmate must submit a written complaint to the Grievance Clerk within 21 calendar days of the alleged occurrence; the Grievance Clerk then submits the complaint to the Inmate Grievance Resolution Committee ("IGRC") for investigation and review; (2) if the IGRC denies the grievance, the inmate may appeal to the superintendent of the facility by filing an appeal with the IGP clerk; (3) after the superintendent issues a decision, the inmate may appeal to the Central Office Review Committee ("CORC"), which makes the final administrative determination.

*Id*. An inmate may only seek relief under § 1983 "[i]f all three levels of review are exhausted." *Id*.

An initial grievance merely needs to place a defendant on notice of the alleged misconduct and include enough detail to allow for any "appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) ("Uncounseled inmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading. . . . In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures."); *Matthews v. New York*

*State Dep't of Corr.*, 9:17-CV-503 (TJM/ML), 2022 WL 823851, at *6 (N.D.N.Y. Mar. 18, 2022) ("Ultimately, in order to exhaust, a prisoner must allege facts sufficient to alert corrections officials to the nature of the claim, and provide enough information about the conduct at issue to allow prison officials to take appropriate responsive measures." (quotations omitted)).

A grievant must comply with the 21-day time limit for filing a grievance, or may request an extension to 45 days based on mitigating circumstances.  7 N.Y.C.R.R. § 701.6(g)(1) (allowing grievant to submit written request for extension of time to file complaint); *Williams v. Priatno*, 829 F.3d 118, 125 (2d Cir. 2016) ("if it is beyond 21 days but within 45 days of the incident, the inmate can request an exception to the 21-day time limit if he can show mitigating circumstances"); *Maldonado v. Bennett*, 9:17-cv-01303 (BKS/TWD), 2021 WL 677845, at *9 (N.D.N.Y. Feb. 22, 2021) (dismissing claims with prejudice "[b]ecause Plaintiff failed to exhaust his administrative remedies for the December 26, 2016 incident, and the 21-day time limit and 45-day period for requesting an exception to the time limit have long expired").  Although this rule generally requires an inmate to separately grieve later-occurring conduct, "the Second Circuit has crafted an exception to this rule for cases 'in which a prior grievance identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit.'"  *Cisco v. Jones*, No. 917CV0347LEKDJS, 2020 WL 1180779, at *4 (N.D.N.Y. Mar. 12, 2020) (quoting *Johnson v. Killian*, 680 F.3d 234, 239 (2d Cir. 2012)); *see also Telesford v. Wenderlich*, No. 16-CV-6130 CJS, 2018 WL 4853667, at *7 (W.D.N.Y. Oct. 5, 2018) ("[T]he inmate is required to separately grieve the later-occurring incidents, unless they involve the 'same

problem' as to which the inmate previously exhausted his administrative remedies."); *Reid v. Nassau Cnty. Sheriff's Dep't*, No. 13-CV-1192 SJF SIL, 2014 WL 4185195, at *27 (E.D.N.Y. Aug. 20, 2014) ("Where a prior [properly exhausted] grievance identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit, the prior grievance is sufficient to exhaust a prisoner's administrative remedies with respect to continuing violations at the facility. However, generalized complaints regarding the conditions of an inmate's confinement will [not] suffice to shortcut the administrative remedy process." (quotations and citations omitted)). But this exception identified by the Second Circuit in *Johnson* applies only to the same conduct occurring after an initial grievance is filed and will not serve to constitute exhaustion of earlier conduct not timely grieved. *See Riles v. Semple*, No. 3:17-CV-2178 (MPS), 2021 WL 5828068, at *3 (D. Conn. Nov. 29, 2021) (noting that *Johnson* "explains that its holding turns on the conclusion that the plaintiff's earlier grievance 'provided the prison administration with notice of, and an opportunity to resolve' the problem at issue, as required by the PLRA" but could not support plaintiff's request that the court "conclude that his later exhaustion of his grievance is sufficient to exhaust his claims going backward, rather than forward, in time").

Here, Defendants do not address *Johnson* and instead urge the Court to deny recovery for every missed Holy Meal not occurring within 21 days of any filed grievance. As to the meals missed before Plaintiff filed his initial grievance on April 11, 2013 (*i.e.*, July 23, 2012; August 17, 2012; October 7, 2012; November 2, 2012; and January 7, 2013), the Court agrees that Plaintiff did not exhaust claims arising from this alleged misconduct.

Therefore, this portion of Defendants' motion for summary judgment is granted.  *See Riles*, 2021 WL 5828068, at \*3.

However, as to the Holy Meals missed after Plaintiff filed his initial grievance on April 11, 2013,[3] the Court concludes that Plaintiff provided sufficient detail about the missed Holy Meals to put Defendants on notice of the alleged misconduct.  Plaintiff's grievances are not merely generalized complaints but instead, contain the specific allegation that despite requesting and being promised receipt of Holy Meals, Plaintiff continued to be deprived of the meals.  This is the same exact conduct forming the basis of this litigation.  In addition, Plaintiff's submissions relating to the appeals process indicate the entire three-step grievance process was satisfied.  Accordingly, Plaintiff's claims arising from missed Holy Meals after April 11, 2013, have been sufficiently grieved and Defendants' motion for summary judgment on the ground of failure to exhaust administrative remedies for any Holy Meals missed after April 11, 2013, is denied.  *See Alster v. Fischer*, No. 09-CV-6510 CJS, 2017 WL 3085842, at \*9 (W.D.N.Y. July 20, 2017) ("Here, the three matters about which Plaintiff exhausted his administrative remedies (failure to allow group observance of Jewish Sabbaths and holy days, exclusion of Plaintiff from Jewish group events and the lack of Jewish worship space) continued as late as August 2009, according to the Amended Complaint.  The Court finds that Plaintiff exhausted these

---

[3]     The Court notes that any meals missed within the 21 days prior to his first grievance filed on April 11, 2013, would be timely grieved, but according to Plaintiff's submissions, there were no holy days within the 21 days prior to April 11.

claims, since they involve a continuation of the same matters about which he exhausted his remedies.").

### B.    Plaintiff's First Amendment Claim

Defendants argue that they are entitled to summary judgment on Plaintiff's First Amendment claim because he has not established any evidence in support of the claim. (Dkt. 59-8 at 5).  For a prisoner to establish a First Amendment free exercise claim, he first "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."  *Brandon v. Kinter*, 938 F.3d 21, 32 (2d Cir. 2019) (quotations omitted).  If this threshold is met, "a defendant can still avoid liability by showing that his or her conduct is 'reasonably related to legitimate penological interests.'"  *Id*. (quoting *Holland v. Goord*, 758 F.3d 215, 222 (2d Cir. 2014)).

Here, on the instant motion, Defendants do not challenge Plaintiff's allegedly sincere belief in the Rastafarian faith.  (*See* Dkt. 59-8 at 6 ("Defendants do not dispute, for purposes of the motion, that Plaintiff was a sincere Rastafarian who was entitled to receive all holiday meals he signed up for.")).  Nor do they argue that they possessed a legitimate penological interest in depriving Plaintiff of any Holy Meals.  (*See generally id*.).  Rather, the disputed issue here is whether there is sufficient evidence that the allegedly missed Holy Meals "substantially burden[ed]" Plaintiff.  *Brandon*, 938 F.3d at 32.

Generally, "a prisoner has a right to a diet consistent with his or her religious scruples."  *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003).  Thus, "[d]eny[ing] prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."  *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir.

- 12 -

2004).  Even a single violation of a prisoner's religious dietary restrictions can constitute a substantial burden on a plaintiff's religious free exercise rights.  *Brandon*, 938 F.3d at 35 ("In the context of religious feasts and fasting, our Circuit has previously held that a small number of noncompliant meals—even a single violation—can be a substantial burden."). While there is not a bright-line test, in *Brandon*, the Second Circuit expressly found that "the court below made a[n] . . . error when it concluded that no reasonable jury could find that the denial of 10 meals was a substantial burden."  *Id.*; *see also Wiley v. Baker*, No. 2:20-CV-154, 2022 WL 3045042, at *6 (D. Vt. June 10, 2022) (noting that "the case law is not clear on precisely how many missed or untimely meals during Ramadan would constitute a 'substantial burden' to a Muslim inmate"), *report and recommendation adopted*, No. 2:20 CV 154, 2022 WL 3042140 (D. Vt. Aug. 2, 2022); *cf. Flores v. City of New York*, No. 21CV1680PGGKHP, 2022 WL 4705949, at *25 (S.D.N.Y. Aug. 8, 2022) ("Nonetheless, 'incidents that are isolated, or few in number, involving a denial of religiously-mandated food, do not give rise to a First Amendment claim.'" (quoting *Maldonado v. Westchester County*, 2021 WL 356155, at *5 (S.D.N.Y. Feb. 2, 2021)), *report and recommendation adopted*, No. 21CIV1680PGGKHP, 2022 WL 4592892 (S.D.N.Y. Sept. 30, 2022).

Defendants argue that Plaintiff must demonstrate Defendants acted with more than mere negligence to establish a First Amendment claim.  (Dkt. 59-8 at 8, 9 (citing *Lombardo v. Freebern*, No. 16-CV-7146 (KMK), 2019 WL 1129490, at *10 (S.D.N.Y. Mar. 12, 2019); *Hankins v. NYS Dep't of Corr. Servs.*, No. 9:07-CV-0408 (FJS/GHL), 2008 WL 2019655, at *5 (N.D.N.Y. Mar. 10, 2008)).  The Second Circuit has not expressly stated

whether merely negligent conduct is sufficient to establish a free exercise claim. *Brandon*, 938 F.3d at 38 ("Our Circuit has not stated whether a First Amendment free exercise claim requires more than negligence, and we need not do so here."). However, it has held that deliberate indifference can sustain a free exercise claim. *Id.* ("Brandon has introduced sufficient evidence to create a genuine dispute as to whether the defendants acted with deliberate indifference in serving him pork.").

The deliberate indifference standard has an objective and subjective component: "First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable state of mind." *Brandon v. Kinter* No. 913CV00939BKSATB, 2023 WL 2382637, at *14 (N.D.N.Y. Mar. 6, 2023) (quotations and citations omitted)). In free exercise claims involving religious meals, deliberate indifference can be established where "evidence in the record indicates that each of the defendants who could be found to have been personally involved was aware that [the plaintiff] had complained at least once" about a religious meal, but continually failed to serve compliant meals. *Brandon*, 938 F.3d at 38 (finding reasonable dispute because the "defendants either directly received a complaint from [the plaintiff] during mealtime or signed off on a grievance that he filed. And, despite the defendants' awareness of the problem, there is evidence . . . that [the plaintiff] continued to be served noncompliant meals . . . .").

Here, Plaintiff states a viable claim for the improper deprivation of Holy Meals after he filed his first grievance on April 11, 2013. The allegations relating to these claims are not conclusory. In addition to being based on Plaintiff's personal knowledge, the factual

- 14 -

allegations are supported by the grievances filed and correspondence written contemporaneously with the allegedly missed meals. Indeed, several of Plaintiff's grievances were granted and contained acknowledgements that Plaintiff had not received Holy Meals. Notwithstanding that acknowledgement, Plaintiff continued to miss Holy Meals. Accordingly, any defendant personally involved with these deprivations could be found to have substantially burdened Plaintiff's religious rights.

Defendants argue that Plaintiff has set forth no evidence that he was deliberately removed from the list of prisoners to receive special meals and that "[e]ven assuming Plaintiff did not receive the meals, there are myriad reasons why that did not involve any of the Defendants." (Dkt. 59-8 at 6). They suggest that "[i]t is possible that (1) Plaintiff was placed on the list but the Non-Defendant FSA failed to inform the incarcerated individual cooks, or (2) the incarcerated individual cooks failed to make the meal, or (3) the incarcerated individual cooks made the meal but put the wrong cell on the note that was appended to the meal, or (4) the incarcerated individual transporter failed to bring the meal to the Block, or (5) the Block Officer removed the meal from the tray, or (6) the incarcerated individual porter did not deliver the meal to Plaintiff's cell." (*Id.* at 7-8). Defendants' list of speculatory reasons that Plaintiff may have missed his Holy Meals only serves to demonstrate that genuine issues of material fact exist as to why Plaintiff did not receive the Holy Meals he was entitled to and expected to receive. In other words, there are genuine issues of material fact as to whether Plaintiff missed his Holy Meals due to deliberate indifference on the part of Defendants, and therefore, summary judgment would be inappropriate.

In sum, taking the facts in the light most favorable to Plaintiff, genuine issues of material fact exist as to whether Defendants failed to provide Plaintiff with his Holy Meals in a manner sufficient to establish a free exercise claim. *See Brandon*, 938 F.3d at 32 (material dispute of fact established from conflicting testimony regarding "the number of noncompliant meals that Brandon was served"); *Ford v. McGinnis*, 352 F.3d 582, 594 (2d Cir. 2003) ("[T]here is apparently a factual dispute as to whether [the inmate] was served a substitute Eid ul Fitr feast on January 7. The scant evidence supporting this assertion suggests that it is unlikely [the inmate] was served something approximating the Eid ul Fitr feast on that day."); *Johnson v. Guiffere*, No. 9:04-CV-57, 2007 WL 3046703, at *6 (N.D.N.Y. Oct. 17, 2007) ("I find defendant's failure to offer justification for his denial of plaintiff's dieting request to be fatal to his motion, and that accordingly he is not entitled to summary judgment in connection with the merits of plaintiff's First Amendment free exercise claim."). Accordingly, Defendants' motion for summary judgment on this basis is denied.

### C.    Personal Involvement and Supervisor Liability

Finally, Defendants argue that Chappius, Mizgala, and Rhodes cannot be held liable for the failure to deliver Plaintiff Holy Meals arising solely from their status as supervisors. (Dkt. 59-8 at 9-12). "As a fundamental prerequisite '[t]o establish[ing] a § 1983 claim, a plaintiff must show the defendants' personal involvement in the alleged constitutional violation.'" *Keesh v. Quick*, No. 19-CV-08942 (PMH), 2022 WL 2160127, at *5 (S.D.N.Y. June 15, 2022) (quoting *Boley v. Durets*, 687 F. App'x 40, 41 (2d Cir. 2017)). It is undisputed that a constitutional violation must be directly attributable to a supervisory

official in order to establish liability and cannot arise merely from their status as a supervisor. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("The [constitutional] violation must be established against the supervisory official directly.").

However, *Tangreti* made clear that this rule does not bar § 1983 claims based on a supervisor's deliberate indifference to an alleged constitutional violation. The Second Circuit explained:

> Circuit courts have considered the impact of *Iqbal* as well. The Tenth Circuit has concluded that, after *Iqbal*, [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, *unless that is the same state of mind required for the constitutional deprivation he alleges*. . . . The focus is on what the supervisor did or caused to be done, the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, *which can be no less than the mens rea required of anyone else.* Simply put, there's no special rule of liability for supervisors. The test for them is the same as the test for everyone else.

*Id*. (emphasis added) (citations and quotations omitted). Accordingly, where the underlying alleged constitutional violation requires deliberate indifference to establish a § 1983 claim, this same test applies to claims against any supervisors. *Id*. As discussed above, a plaintiff may establish a free exercise claim based a prison official's deliberate indifference to their complaints regarding religious meals. *See Brandon*, 938 F.3d at 38; *Keesh*, 2022 WL 2160127, at *6 ("In other words, where a plaintiff advances a free exercise claim, he must establish that the defendant at least had reason to know 'the facts rendering [his conduct] illegal.'") (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). Therefore, Plaintiff need only raise a genuine issue of material fact as to whether

Chappius, Mizgala, and Rhodes were personally involved and deliberately indifferent to his complaints to avoid summary judgment.[4]

Plaintiff has done so with regard to Mizgala and Rhodes, but not Chappius. There is evidence in the record that both Mizgala and Rhodes were personally involved in addressing Plaintiff's complaints about the missing Holy Meals, and despite assurances that they would rectify the issue, they failed to do so. At the very least, there are disputed issues of fact pertaining to Mizgala's and Rhodes' conduct. Specifically, the Third Grievance names Mizgala and alleges that Mizgala interviewed Plaintiff and personally promised that Plaintiff would begin receiving Holy Meals. (Dkt. 72-3 at 33). The Fourth Grievance names Mizgala as well, although it does not allege any specific misconduct. (*Id*. at 42-43). Plaintiff's May 4, 2014, letter to Mizgala references an earlier conversation with Mizgala and his assurance that Plaintiff would receive his religious meals. (*Id*. at 15).

---

[4]     The Second Circuit in *Tangreti* noted that *Brandon* did not consider the changes to supervisor liability implicated by *Iqbal*, instead deriving its supervisor liability holding from the "special standards" set out in *Colon*. *See Tangreti*, 983 F.3d at 617 n.3. However, this Court is not relying on the portion of *Brandon* that applied a "special rule" for supervisor liability under *Colon*. Instead, as stated above, the Court is relying on *Brandon's* endorsement of the deliberate indifference standard for *all* free exercise claims, whether they concern a supervisor or not. *Tangreti* specifically noted that deliberate indifference-based claims still apply to supervisors when the underlying claim uses this same standard. *Id*. at 618. Accordingly, *Brandon's* deliberate indifference standard still applies for determining supervisory liability in free exercise claims, not because it is a "special rule" like that used in *Colon*, but because that is the general rule for all free exercise claims. *Id*. at 612; *see also Baltas v. Jones*, No. 3:21CV469 (MPS), 2021 WL 6125643, at *12 (D. Conn. Dec. 27, 2021) (permitting supervisory claims to go forward against supervisors who allegedly "substantially burdened [the plaintiff's] right to free exercise of his sincerely held religious practices by failing to provide him access to such practices after he informed [her] of his religious deprivation.").

Rhodes is also identified in the Fourth and Fifth Grievances, although no specific misconduct is alleged. (*Id.* at 42-43, 49-52). However, Plaintiff's October 29, 2014, letter to Hawk states that Rhodes personally came to see Plaintiff as part of an investigation into his grievance regarding his missing Holy Meals. (*Id.* at 17).

Considering this evidence in the light most favorable to Plaintiff as the non-moving party, the Court concludes that it is sufficient to survive summary judgment. In other words, while Mizgala and Rhodes have submitted declarations that deny personal knowledge of Plaintiff's allegations (*see* Dkt. 59-4 at ¶ 2 (Mizgala Declaration); Dkt. 59-5 at ¶ 2) (Rhodes Declaration)), Plaintiff's nonconclusory allegations, taken in the light most favorable to him, are sufficient to withstand summary judgment under *Brandon's* deliberate indifference standard. *See Brandon*, 938 F.3d at 37; *Hill v. Cnty. of Montgomery*, 9:14-cv-00933 (BKS/DJS), 2019 WL 5842822, at *6 (N.D.N.Y. Nov. 7, 2019) ("Plaintiffs have introduced evidence that both Amato and Franko were aware of inmates' complaints and grievances regarding the insufficient portions and hunger and that they failed to make any changes to the quantity or quality of the food provided at MCJ . . . . This evidence raises a genuine issue of material fact . . . ."). Accordingly, summary judgment for Rhodes and Mizgala on this basis is not warranted and is denied.

However, Plaintiff fails to set forth any allegations regarding Chappius' personal involvement with the Holy Meal deprivations. While Plaintiff references Chappius in the Fourth and Fifth Grievances, he fails to allege any personal involvement in his Holy Meal deprivations. (*See* Dkt. 72-3 at 42-43, 49-52). Plaintiff also wrote a letter to Chappius on April 25, 2013, complaining of the missed Holy Meals. (*Id.* at 24-25). However, unlike

the aforementioned letter to Hawk which referenced Rhodes personally visiting and speaking with Plaintiff about his Holy Meals, this letter makes no such reference to any personal involvement by Chappius. The receipt of a letter, alone, is insufficient to establish personal involvement under the *Brandon* deliberate indifference standard. *See McCrary v. Marks*, 836 F. App'x 73, 74 (2d Cir. 2021) (granting summary judgment in favor of supervisor in First Amendment claim because "[d]rawing all inferences in [the plaintiff's] favor, the most he has alleged is that [the supervisor] received his letter and directed someone at the TVPA to respond to it. This is clearly not enough to state claim against [the supervisor]."). Therefore, summary judgment is granted with respect to all claims against Chappius.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 59) is granted to the extent Plaintiff bases his claims on missed Holy Meals before April 11, 2013, and it is also granted in favor of Chappius, but it is otherwise denied. The Clerk of Court is directed to terminate Chappius as a defendant in this action.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: March 23, 2023
          Rochester, New York

- 20 -